Good morning, everyone. Good morning. Good morning. Wake up. It's not that bad. Before we hear arguments, Judge Rawlinson and I would like to thank and acknowledge Judge Leslie Kobayashi, who's visiting with us from the District of Hawaii. And we're very appreciative and thankful for the time that she's willing to give to us to help us with our caseload. So with that, we'll turn to the calendar. The first case on the calendar is Drake v. Saul, but that's been submitted on the briefs and record. And our next case for argument is Christian v. Umpqua Bank. Good morning, Your Honors. Good morning. May it please the Court, Counsel, Nadia Dahab, for Plaintiff Jennifer Christian. Just a quick, before I start, a first point about logistics. As the Court may know, I've ceded five minutes of my oral argument time this morning to the EEOC. Your Honors, in this sexual harassment and retaliation case, Plaintiff Jennifer Christian, who was with me in the courthouse this morning, was the victim of conduct by a customer of that was actionable under Title VII for several reasons. First, a reasonable juror could have concluded that the customer's conduct was sufficiently severe and pervasive so as to constitute sexual harassment. Second, a reasonable juror could have concluded that Umpqua, by not responding to her reports of that harassment in a manner that was reasonably calculated to end it, ratified, or acquiesced in that conduct. And third, Plaintiff had a reasonable belief that she was engaging in protected activity when she declined to reopen the customer's account and refused to return to work until Umpqua could ensure her safety. So, Counsel, how was that protected activity? Your Honor, at the time that Ms. Christian declined to reopen, she had a reasonable belief that she was opposing a hostile work environment that Umpqua had either ratified or acquiesced in, right? Generally not right. Generally, protected activity is filing a report with the EEOC or taking some other action to formalize the notion that the conduct is unwelcome. So, what's your strongest case to support the proposition that closing the account and refusing to continue to work constituted protected activity? What case is closest to those facts that support your argument? Well, I think, Your Honor, I think the cases support that Well, give me your strongest case for that proposition. I mean, I look to, I look mostly to Fulkerson and Little for guidance on this standard, right? And I think it's clear from the record Please don't say right. Excuse me, Your Honor. I think the record shows that Ms. Christian made a clear report not only to her manager, but also to the managers, to other supervisors at the bank, the Director of Human Resources, the other area managers that were at the bank. And I think that is that she has, at least she perceives, or she reasonably believes, that she's been subjected to a hostile work environment created by Well, why did you say the protected activity was refusing to open the account and refusing to stay at the location? Why are you pinpointing those as the protected activity? I suppose I look at the timeline of events, Your Honor. You know, she, this sort of culminated in the events that occurred in the mid and late September 2014. And by that time, she had told her manager at the bank that she feared for her safety. He had agreed, you know, by agreeing to, by telling her that he would keep the customer out of the bank, he sort of, you know, I suppose ratified her at least reasonable belief that she, you know, she perceived herself to be in an unsafe workplace by his presence. And that all culminated in these events that happened on September 13th and September 26th, and September 23rd, excuse me. And at that time, and she right away again told her manager that by reopening the customer's account, she had notified him previously that she believed that she was subjected to a dangerous workplace. That she reminded him of that. He ignored her essentially. And I think that's enough for her to make a report at that time to both Mr. Sanceri, Mr. Souvenir, you know,  so counsel, assuming what you're saying is that her, her projective activity was reporting sexual harassment that, that subjected her to, that was so pervasive and subjected her to hostile work environment. Let's assume that for a moment. Where's the, the, the temporal relationship for a bit on the retaliation claim that it was based on her exercising a protected right? Sure, sure. I think the record shows that, well, for the most part, first of all, I guess clarify for me, what are you saying is the adverse employment action? I think that the first adverse employment action, to me, the most clear adverse employment action was that Ms. Christian had to switch locations, right? She, excuse me, she, you know, had UMQA taken the immediate and appropriate corrective action that it should have taken at the time she made the report. Ms. Christian should have been able to stay. But she did it voluntarily, right? She decided that she wasn't going to stay. She said she had medical support that she shouldn't return to work at that location. And so she chose to work at another location. So these other locations, however, had different job duties and much less hours. So you're saying that's the adverse employment action? I guess I would back up your honor a little bit, you know, respectfully, I'm not, I think there is a bit of a dispute in the record as to whether Ms. Christian voluntarily took herself over to Salmon Creek or whether Ms. Wolfram and saying, you know what, you know, before they told her, first of all, that they closed the count, before they told her that they would, that they would tell him not to come back, they said to her, why don't you consider switching locations? And had they told her, I think that, that the account would be closed and that they would actually take the immediate and appropriate corrective actions that they should have taken, they wouldn't have had to say, you know, the other alternative for you is to switch locations entirely. Okay. So you're saying that at this stage, looking at the light most favorable to the non-moving party, there's a question of fact, whether she voluntarily did it or they sort of forced her into that. Okay. So that's the adverse employment action. And then you're also saying her, her resignation is also adverse employment action or no? Yeah. You know, I, um, I suppose I'd say that the, the series of events that occurred after that, you know, we're, we're part, we're wrapped up in that. Okay. So where, where's the connection between her, um, assuming that she did, um, exercise her right, her protected right. Where's the connection, the causation between her exercising it and what you claim to be the retaliation? I think on this record, your honor, the, the, the proximity temporally frankly between her, you know, um, engaging in protected activity and her, um, you know, as we view it effectively being forced to transfer, that's close enough in time. There's no other, could I just clarify one thing here? Did the district court terminate the retaliation claim at the prima facie case stage or did we get to, yes, yes. Did the district court get to, uh, um, you know, um, uh, pretext. No, the district court did not get to pretext. It was all, this all happened to the district court's ruling was all at the prima facie case. That's correct. That's correct. Your honor. And basically I understood, I understood your argument here is at least at that point in the analysis, there was sufficient record evidence to meet the prima facie case. And really what I understood you'd be saying your argument to be was, well, it should go back because we met our prima facie case and the district court can consider pretext and all the other analytical points that are necessary. Is that right? That's correct. Am I misunderstanding that? Nope. I think you're understanding that correctly. So the, so the district court said in terms of the prima facie case that there was no material issue of fact on that prong? Yes. Yes. That's exactly what the district court said. And your honors, I'm mindful of my time and the fact that I've left five minutes for the EEOC. My colleagues don't have any questions right now for you. We'll, I'll make sure you get time for a final meeting. So, okay, well let's hear from the government. Okay. Thanks. Good morning, your honors. May it please the court. I am Philip Covnet, counsel for the EEOC as amicus. Um, I would like to focus on the sexual harassment claim, but I would like to address judge Rawlinson's question about the best case for why this constitutes protected opposition under the anti-retaliation provision. And that would be the Trent versus Valley electronic association case. The site is 41 F third five 24. That that case has very similar facts. It was a complaint about a non-employee engaging in offensive conduct to the employer. And this court established that there was a reasonable belief that what the plaintiff was opposing was a violation of title seven and therefore it constituted protected opposition. I asked the question was because opposing counsel talked about the protected activity being, uh, the declination of opening the account and the, um, not working at that branch anymore. So my question was directed specifically toward those discreet events as being protected activity. So that's not your best case for that proposition, right? For that. We're not taking the proposition necessarily that the refusal to open the account is what was protected opposition. It was her complaints to Mr. Sanceri as well as the other managers about what the customer was doing in that sense. She was opposing both the customer's behavior as well as the bank's failure to take effective remedial measures and that constitutes protected opposition. Um, I would like to shift gears to talk about the severe pervasive standard as well as, um, the standard for imputing liability to the bank. Counselor, before you do that, why did the EEOC, uh, decide to appear in this case? Well, Your Honor, as the, the agency that administers and enforces title seven, we have a strong interest in, um, making sure that the standard is applied. The standard for what constitutes actionable harassment as well as the standard for imputing liability is applied correctly. Uh, the district court here in our view erred in both of those analyses. Um, in particular with regard to the, whether the behavior was severe or pervasive enough to constitute sexual harassment, the court just overlooked several instances of harassment that the customer subjected Ms. Christian to that contributed to the hostile work environment. Um, and the courts, the district court seemed to be under the impression that unless there was direct personal interaction between the alleged harasser and the plaintiff, that somehow, um, the acts could not contribute to a hostile work environment. But that is not the law. So long as the plaintiff becomes aware of the acts, they can certainly be counted towards the severe or pervasive nature of the conduct. Um, and here we had a situation where this customer was going into other branches of the bank and in Ms. Christian's words, badgering her coworkers about how to get a date with her and her coworkers were repeatedly warning her, um, to be careful because they were worried about her safety. And, um, she became aware of this and the district court completely ignored that in its analysis. And I think that was a critical oversight. Were, was she being informed like on a regular basis through coworkers who worked at the other banks? I mean, it was like an ongoing kind of thing or was it just... Considering the evidence in the light most favorable to Ms. Christian, she initially showed the first note that, um, the customer left for her to a coworker who said specifically, be careful that this doesn't escalate. This could, you know... Now was that person from the same bank or from a different... That was a coworker in the same bank. And then, um, then she received notes and flowers and brought that to the attention of her superior, Mr. Sanceri, who called the behavior disturbing. And at that point, at least decided internally to make a decision to bar the customer from the bank. But then he took no action to implement that decision other than to encourage Ms. Christian to make a phone call, um, to rebuff the customer's advances. But we know that was not effective, an effective remedial measure because just a day or two later, the customer came back into the bank and left another note for Ms. Christian. So, um, it was a persistent pattern, both things that she was observing firsthand as well as information she was getting from her colleagues. Um, and, and I think, you know, the, again, the district court's critical errors were overlooking certain instances that contributed to the hostile work environment. And the court also seemed to believe that acts that occurred in February of 2014 were not sufficiently related to the acts that occurred in September of 2014, such that they could constitute a single hostile work environment. Um, but that is also incorrect under the Supreme Court's decision in Morgan. So, um, it's the EEOC's view that a jury could find a reasonable woman in Ms. Christian's shoes would find this to be a severe, pervasive work environment. Let me ask you, are there, I thought the reason why the EEOC might have submitted an amicus brief here is because there aren't that many cases dealing with stalkers. Your Honor. Customer kind of, facts like this. Right. There aren't a lot of cases like this. Is that right? Well, they happen with enough frequency that it's a recurring issue, but I agree, it's certainly not the, the garden variety sexual harassment case. I mean, typically it's a coworker or a supervisor. Uh, EEOC had a case in the Seventh Circuit, EEOC versus Costco, which involved a customer harassing an employee. Um, and, uh, in that case, the Seventh Circuit was finding a sufficiently severe, pervasive work environment. So, um, I mean, this case does have some of the hallmarks of that case, and I think that may have something to do with it. But typically as amicus, we're interested in correct interpretations of the law application of the correct standards. Um, and with the very little time I have left, I would like to just address the, the standard for imputing liability to the bank. I think there are really two critical moments in the record here, um, but from which a jury could find that Mr. Sanceri ratified or acquiesced in the conduct. And I, the first was in February of 2014 when, as I mentioned, he made a decision to bar the customer from the bank, but he didn't actually implement that decision. He didn't say anything to the customer. He just urged Ms. Christian to, uh, rebuff the customer's advances herself. And then if that were not enough, in September of 2014, the customer came back into the bank. Ms. Christian brought Mr. Sanceri aside and said, this is the customer I've been telling you about. You said you would bar him from the store. And Sanceri denied remembering anything about this and then, um, allowed the customer to open a new account. So at that point, a jury could find that the, that Sanceri was ratifying or acquiescing in the customer's conduct. Counsel, is the one element of protected opposition, but we have not taken a position on the other two elements of the retaliation claim. All right. Thank you. And if there are no further questions, I will sit down. Thank you, your honors. Thank you. Good morning, your honors. May it please the court. My name is Steven Capelo. I'm here on behalf of Umpqua Bank. With your permission, I'm going to start with the issue of whether Brad's conduct can be imputed to Umpqua because it's dispositive of every issue in the case, including imputing hostile work environment and also the protected activity prong of the retaliation claim. Do you think that's your strongest argument? I think it's the most important argument because it's the one argument that resolves. But do you think that's your strongest argument? I guess it is our strongest argument in the sense that it's dispositive of everything. I think we have good arguments along the way and if I have time, I'll reach those. But I think once you hear that, you'll see why we're focusing on this. So this court's recent decision in Campbell v. Hawaii Department of Education, which is 892 F3rd 1005 at 1018, provides the relevant standards. First, we evaluate the reasonableness of the employee's corrective measures only from the perspective of what the employee knew or should have known at the time that it acted. The employee or the employer? The employer. Thank you. What were the employer's corrective actions in this case? That's a really important question here. And there's two sets of corrective actions, right? We've talked about the fact that there are two sets of incidents, right? In February of 2014, Ms. Christensen was receiving unwelcome notes and flowers. And so the question is, what was the response to that? And then in September 26, we have two incidents, one where Brad, as he's known, opens a bank account and also he drinks coffee, right? And there were corrective actions to both. And I think it's really important when we're looking at that to think about the instructions from Campbell because not only does it tell us that we look at it from the point of view of what the employer knew, but also tells us that the response can be incremental, right? So what was the response? Yes. So to answer your question, the response to the unwelcome flowers and notes was twofold. That's in February 2014. February 2014. Firstly, there was a Who made the call? The call was made by Ms. Christensen. Was that reasonable? I think it is. To have the victim of the harassment call the harasser, do you think that's reasonable? Let me, if I may, read to you the joint statement of facts that was presented. Well, answer my question first and then you can read me anything you want. But do you think that was a reasonable response? Under the circumstances of this case, I do think it's reasonable. And let me tell you why. Because I'm relying on the record, right? Don't say right to me because... Am I doing that to you? Yes. I apologize. I'm relying on the joint statement of facts that was presented to the district court. And joint statement number 10 says after receiving flowers on Valentine's Day, plaintiff had a discussion with her manager, Chris Senseri. Mr. Senseri offered to talk to the customer and tell him that the flowers were inappropriate and the plaintiff was not interested. Plaintiff told Mr. Senseri that she would call the customer. And then she called the customer. Is there a question of fact about that? Does the plaintiff concede that she told her supervisor that she would call... Does plaintiff agree with that statement in the record? That's why I was referring the court to the joint statement of facts that was presented by both the plaintiff and the defendant to the district court. And of course, what the district court reasonably relied on in making its determination. Okay. So your argument is because they agreed to that, that it's not a disputed fact that she voluntarily agreed to count. Okay. Your Honor. So that's one part of the response. Okay. But how is that attributed to the employer being reasonably responsive? I'm sorry. I don't understand. So that was an agreement that they reached in terms of resolving the issue. Why didn't the employer just say, well, you know, I'll contact... No, that's okay. We'll contact. That certainly could have been another arrangement and maybe... Why is that the obligation of the employer? Every respective one of the employees says, yeah, sure, I'll call him. I think you have to look at it in the context of the entire response. So part of the response was to call the employee. And I understand that maybe that was the wrong decision in retrospect. But that was... Well, the question is whether it was reasonable. Well, there was... I think it was reasonable under the... I mean, why couldn't a reasonable trier fact say, no, that's just unreasonable? That was the bank's responsibility. It has to take care of its employees. And that's the end of the story. I think when two people sit down and work out a plan, and if the manager says, I'm going to call, and the employee says, no, I will call... So I guess we're not disputing that you're saying this is what happened and what was agreed upon. I guess our question really is, even if they reach that agreement, does that really get attributed to the employer as reasonable action? For instance, if we change the facts a little bit, and it was actually either a co-employee or a supervisor who was doing this, and an employee complained about it, would it be then discharging the employer's duty to address in a timely and reasonable way these allegations of sexual harassment by saying, I'll talk to the employee or your supervisor, and the employee's saying, no, I'll do it. Can the employer say, okay, go ahead? And that would be a reasonable discharge of the obligation. Well, I would be hesitant to draw a hard and fast rule that when somebody receives flowers or a note or an invitation for a date to say that it's incumbent on the employer to contact the person and tell them that that person's not interested. So let's sort of stop there. Okay. So if we find that it's pervasive and serious, right? And unwanted. And unwanted. So it's not so much, is it flowers? Is it notes? It's unwanted, right? And there's enough in the record at this point, summary judgment stage, to say it's unwanted, right? And scary because people are advising her, hey, you'd better watch yourself. Okay. So I guess the issue is by having the agreement, as you put it, that the employee talked to the unwanted advancer of these attention, is that reasonable? And does that discharge their obligation? In conjunction with the decision to also, Mr. Sonseri also said that if he came in the bank and he would tell him not to return. So when you look at what was done, it was immediate, it was proportional, and it was effective. There was a letter that was in the record, unwanted communications or flowers to Ms. Christiana. Are you segmenting the February and the September activities as being separate incidents? I am, yeah. Where in the record is the statement of facts, joint statement of facts? Where's that in the record? That is at ER, it starts on ER 26. Okay. And the statements about the fact that Ms. Christiana had previously received flowers from other customers, and her discussion with Mr. Sonseri is at ER 27. Okay, so give me your reasoning why you separate the February and the September events. Right, because that's what Campbell tells us we do. We look at this as an incremental response. We had one type of behavior, right, where we had this unwanted communications in terms of sending notes and flowers. That particular behavior was successfully addressed. You're saying it's successfully addressed because there was a period of time where the activity didn't persist. No further direct communications by Brad, ever. Not just in seven months, but ever. There was that letter that was in transit, but once they set on that course of action, that issue was timely and fully resolved. Well, he appeared in September when they were at that... September, right. We had Brad return, right? Well, at that community event that they were doing the charity work. That's right. So first he... Stocks are there. The bank is very committed to helping homeless people. There was an event where they were handing out ice cream, and he was present at the event. And she saw him there, and apparently he stared at her. And then on September 26th, he's a homeless vet. He wanted to go back to school, according to the formal complaint. He came back in the bank. He asked for a different teller to open the account for him. A different teller did in fact open the account for him. It took a really long time, right, because he didn't have a fixed address. He opened a $25... Well, the joint statement of facts that you said says that Mr. Censeri asked the plaintiff to open the account in September. The joint statement of facts says that... Right. So what I said, Your Honor, is when Brad walked, to be clear, when Brad walked in, he didn't ask for Ms. Christian to open the account for him. The person he asked was unavailable. As we know, Mr. Censeri didn't remember this incident from seven months before. And he asked Ms. Christian, Ms. Christian reminded him, and Kelly Reynolds ended up opening the account. And Ms. Christian was upset because it took her a very long time because being a homeless vet, he didn't have a lot of information, so it took a while. And then a couple days later, he came in and drank coffee for 15 minutes according to the formal complaint and used the Internet, and he left. And at that point, the bank took very strong, had a very strong response. Without being asked, remember, she didn't file her formal complaint until October 4. It's dated October 3, but it wasn't received until October 4. Prior to receiving the formal complaint, the bank called security, gave her paid leave, contacted her every single day at home, gave her the choice of whether to take corrective actions, further corrective actions at the bank or to transfer. And we know from her brief in the underlying case that she demanded, in her words, she insisted on being transferred. They contacted two different branches in order to make the arrangements for that to happen. Counselor, are you leaving out something? Wasn't there a point when the plaintiff was told that she could go into the break room whenever her harasser came into the bank? Apparently, she was told that. That was something else. That never happened, of course. But was there a reasonable response to tell her to go into the break room whenever the customer came into the bank? I know it's given sort of a very pejorative sense that that was sort of like the bank was being indifferent in telling her that that was the sole solution, but I don't think it was intended that way. The way I read it is not only doing all these protective measures, but if for some reason they don't work, you can leave your station and hide behind so that you're protected. But should an employee have to hide in her own workplace? Well, she never did hide, of course. But the suggestion was made that she do so. Is that reasonable? A reasonable response on the part of the employer to tell the victim to hide as if she were doing something wrong? I think if standing alone, that would be very unreasonable. But I think in the context of this suite of actions that were taken, all of which were successful to address her concern. So that might be a point on the merits for a jury to decide, but we're at a summary judgment stage, so aren't we supposed to make the inference in the light most favorable to the non-moving party? On the issue of the break room? Sure. Right. Whether or not that was reasonable or not. Okay. So what you're saying is the reasonable response was incremental. I would agree it's incremental, but I mean, it seems like pretty glacial in the beginning, and then in the end, after they allowed him to reopen the account. So you're saying that letting him reopen the account is a neutral factor? It's not indifference to their employee's complaint? So even in hindsight, right, if they should have told this homeless, disabled veteran that he couldn't be allowed to open an account? Just at that branch. Just where she was. Not that he couldn't open an account, but he couldn't be in the branch where she was because he had arrested her. So in hindsight, maybe that would have been a better response? We don't want to judge them by hindsight. We're looking at what is their response and their obligation under the law. And what we look at is within three days, before she files a formal complaint, the bank takes immediate and drastic and effective action. So really the question is, is that why do they let him reopen the account and then he comes in one more time where he came in several times into other branches and left messages for her in February? And the plaintiff argues, and there's a question of fact, right? Did they really do anything? And then suddenly in September, he comes in one more time and then they launch into all of these actions. So on a summary judgment standard that we're supposed to look at, is that reasonable and was that immediate as required under the law? That's a fair question. And that's where I think the joint statement of facts is very You have to look at the severity and pervasiveness and also the immediacy of the response. In both cases, the response was immediate and effective. The question, the difference is the severity. The perception was that the second round in September was more severe and the response was more severe. Are you saying that there is not a material issue of fact on whether or not the action taken was immediate? There is no question? Under the standard the district court correctly applied was whether or not a reasonable juror, which is the standard that's used in these cases. And if you look at, I think at every case that's addressed this issue, summary judgment would be. You're over your time, but I do have one last question for you, which is, so the EEOC just argued that the period of time between February and September that the district court didn't seem to place any significance to what, the customer went into the other banks and inquired about it, about the plaintiff. And employees from the other banks, in conversations with the plaintiff, would be late, you know, that the customer had been in. And that you need to consider that as well in the overall analysis as judge, because you make a fairly sharp distinction between the February event and the September event. And I don't know that you can do that at summary on this kind of record. I understand the concern. Part of what I rely on is I look and put a lot of weight on that formal complaint, because remember, what is imputed, the knowledge that's imputed to the bank is only what's communicated. So the formal complaint doesn't contain any reference to those events. But you're not denying that she told Mr. Sinceri back in February, right? You're saying that that's not sufficient for an employee to raise the issue and then trigger an obligation on behalf of the employer? My understanding of those communications, I'm just reading the record like you are, right, is that she communicated that she was receiving notes and flowers, but of course I wasn't, I wasn't present either. All right. Thank you. We let you go over your time and I'll put two minutes on the clock for your rebuttal. Thank you, Your Honor. Just a couple of points I want to make in response to Mr. Kaplow's argument on the ratification and acquiescence analysis here. I want to make clear in plaintiff's view, UMQA's decision to have Ms. Christian discharge the obligation, the employer's obligation to keep the customer out of the bank was not reasonable. And not only was it not reasonable, it was not reasonably calculated to end the harassment. Mr. Kaplow, you know, suggests that there was a letter in transit, but they couldn't, you know, that letter was already in transit and otherwise the harassment ended, stopped there. I will point out that in UMQA's own brief, it says on page seven that Mr., uh, I'm sorry, Brad came into the bank two days later and dropped off that second letter himself. He, but he said that the, Ms. Tansiri offered to make the call and the plaintiff volunteered to make the call. What are we to make of that series of events? Your Honor, I don't think, I think there is certainly a dispute of fact, um, as to whether the conduct was reasonable. I would say that, that UMQA's characterization of her having volunteered to make that call is not supported by the record. But that's an agreed, agreed upon statement of facts, though. You know, the agreed upon statement of facts, I think, says that she told Mr. Tansiri she would make the call. That is not that she volunteered to make the call. And, and in, in plaintiff's situation, But it says Ms., Ms., uh, let's see, plaintiff told Mr. Tansiri that she would call the customer. Right. And there's a footnote to, I guess, a deposition transcript. And, and I don't think, that, that first of all doesn't suggest that she volunteered to make the call. Right, we don't know. And, and frankly, I think that in, in, in plaintiff's situation where she has been harassed by, by the customer's presence in her workplace, of course she doesn't want him to come back in. Um, when, when Mr. Tansiri said, you know, next time I'll see him, I'll tell him not to come in the bank. She'd rather, you know, tell him herself, let, make it so that he, he doesn't have to, he never comes in again. Right. Um, and I think there's also evidence in the record that, that suggests that Mr. Tansiri thought it would be best if she would do that. So, one, she didn't volunteer to make the call. And I don't think that absolves, absolves UMQA of its liability here, um, when it was its, ultimately its obligation as the environment. Okay. Thank you, counsel. Thank you. Thank you, counsel. We appreciate your arguments. Matter submitted.
judges: Paez, Rawlinson, Kobayashi